UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal No. 04-280 |
|  | : | Hon. Faith S. Hochberg, U.S.D.J. |
| v. | : | Opinion and Order Denying New Trial |
| HAKEEM CURRY[1], et al., | : | January 31, 2007 |
| Defendants. | : |  |

Hochberg, District Judge:

Defendant Curry has moved for a new trial on two grounds: (1) the method of identifying the alternate jurors; and (2) claimed prosecutorial misconduct.[2]

    Jury selection Method

At the outset of the trial, Curry's defense counsel requested that a "struck jury" method of selection be used. The Court granted the application, and then began a dialogue with counsel on the process to be used for the selection of jurors. All counsel concurred in the method used.

The method called for selecting a total number of jurors, including the 12 regular jurors plus 6 alternates, due to the unusually long Summer trial. The Court informed counsel that, in order to be sure that all jurors paid close attention to the evidence throughout the long, hot summer months in the old courthouse with cantankerous air conditioning systems, the identity of

---

[1] Mr. Curry's counsel has made a request that the Court use the "ie" spelling instead of the "y" spelling when referring to Mr. Curry. However, because all of the Court documents spell Mr. Curry's name with the "y", the Court will continue to do so not out of any disrespect to Mr. Curry but so that the documents remain consistent.

[2] Defendant Baskerville joined in the motion made by Curry.

the alternates would not be the "last four in the box." The Court wanted to ensure that all jurors knew that each must pay close attention beca

00use any of them could be deliberating at the conclusion of the trial. All counsel understood the method and none objected.

>The Court: We're going to seat 12 and six. We will -- we're going to seat 18, and we're not going to decide the alternates until the end of the case.
>
>Mr. Plaisted: That's fine. That would make 18, 38, 40 to be safe.

Transcript of May 15, 2006, p. 15.

The Court again stated the method for selection of alternates to make sure it was clear to everyone.

>The Court: We're going to do 18 and we're not going to designate in advance who the alternates are, we're going to tell them in the preliminary instructions to the jury who are sworn, that any of them could well be jurors deliberating. None of them should assume by the location of their seat they're an alternate.

Transcript of May 15, 2006, p. 17.

The method for selecting alternates came up again when trying to determine the number of peremptories each side was entitled to.

>Mr. Plaisted: We were in agreement as to the methodology for doing this, because Your Honor wanted 18 without designating, that made perfect sense, and we were --
>we waive anything to accomplish that. We thought we had.

Transcript of May 15, 2006, p. 26.

All counsel agreed that the usual separate designation of peremptory challenges for the regular jurors and the alternates would be waived, and that the total number of peremptories would be increased to account for both the fact that there were 2 Defendants and the fact that

2

peremptory challenges would be made for a single group of 18 jurors. Extra peremptory strikes were given to defense counsel. Transcript of May 15, 2006, p. 26.

Two hundred prospective jurors were questioned. After excuses for hardship and other cause, all counsel made their peremptory strikes. There were 2 jurors remaining from the entire panel of 200 at the conclusion of this process. All counsel stated that they were satisfied with the jurors chosen to serve.

During the brief continuance after the completion of jury selection and the beginning of opening statements,[3] two jurors, numbers 11 and 18 were excused for medical reasons.[4] Sixteen jurors remained for the duration of the long trial.

Curry's counsel's comments during trial again confirmed that he understood and concurred in the decision not to simply identify the last 4 jurors as the alternates, and instead to randomly designate 12 of the jurors as the "regular" jurors prior to deliberations. During a colloquy in chambers on July 12, 2006, the Court questioned Juror #12 about her concerns relating to car security in the jury parking lot. Then the Court asked defense counsel whether they wished to excuse her. Counsel stated that they did not want her among the 12 who would eventually deliberate, but that they wanted the court not to excuse her right away so as not to

---

[3] The short continuance was granted to enable defense counsel Plaisted to prepare his opening statement and to give Mr. Archie an additional continuance. Mr. Archie (counsel for Baskerville) in April, 2006, joined the request made by Mr. Nuzzi for a continuance until June 12, 2006. The Court first granted a short continuance until May 15 and then extended it to May 22 for opening statements.

[4] Because Curry's motion made arguments based on race, and for that reason only, the Court will identify the race of certain jurors. However, by so doing, the Court does not suggest that any reference to race is appropriate in either excusing jurors for medical reasons or the random designation between regular and alternate jurors. The two jurors excused for medical reasons were Caucasian.

draw undue attention to her concerns. Transcript of July 12, 2006, p. 75.  Specifically, Mr.

Plaisted stated:

> since we're so close to the end, I would ask you leave her on the jury, and then I guess we're going to go through a process where we select 12 before they go to deliberate.  I would ask that her number, if we're selecting 12, that way her number not be in there, so she not be selected, so there's no way of her not happening to be on the jury is connected to this event.

Transcript of July 12, 2006, p. 75.  The Court did what Curry's counsel requested.

### Written Notice of Method for Designating Alternates

On July 19, 2006, the Court placed a one-page order on counsel table before the start of the trial day, setting forth the specifics of the process for designating the regular and alternate jurors, and had a colloquy with defense counsel.  Mr. Curry's counsel read the order and discussed the portion of it that asked him to make a final decision about whether the defense wished to excuse Juror 12.[5]  Transcript of July 19, 2006, p. 3.

    Mr. Plaisted:  I had one matter.  Your Honor did give us an order, I think both about - - about Juror Number 12.

    The Court:  Oh, yes.  Juror Number 12, what do you want to do about her?

    Mr. Plaisted:  We previously asked she be excused then.  That's still our - -

    The Court:  Yes.  I - -

    Mr. Plaisted:  - - in the manner your order says.  We appreciate.

    The Court:  What stage - - I think I will excuse her at the - - when I do the designation, which will be at the end of summations before the final charge.

    Mr. Plaisted:  Yes.

---

[5] Solely for the reasons stated in footnote 4, above, the Court notes that Juror 12 was an Asian female.

The Court:  I will simply excuse her with no fanfare and no commentary.

Mr. Plaisted:  Well, I just - - Your Honor had indicated in the order, it said the court will pick the 12 slips and, you know, her slip just won't be put in, there's no singling except - -

The Court:  Except I'm picking 12 slips and three slips in order.  If her slip is not in there, do you want it off to the side?

Mr. Plaisted:  Yes, just off to the side.

The Court:  Off to the side.

Mr. Plaisted:  So it's not one of those selected.  So when she goes, she'll go with who is extra.

The Court:  So you're not actually excusing her.  The alternates stay, because they may well be called back in.  I'm going to tell the alternates - -

Mr. Plaisted:  Okay.  I understand.

The Court:  - - if there are long deliberations, we may well need the alternates.

Mr. Plaisted:  Yes, as late as possible.

The Court:  So excuse her, but as late as possible.  Will do.

Transcript of July 19, 2006, pp. 3-5.

Mr. Plaisted's remarks clearly confirmed yet again that Curry's counsel knew and concurred in the random selection of 12 regular jurors from all of the jurors except juror # 12. The Court agreed to excuse Juror #12 in the manner sought by Curry's counsel.

Following this colloquy, neither defense counsel asked for any further discussion, nor request for clarification, nor objection of any kind.  There was ample time to object, because the actual random selection did not happen for the entire day, which had many breaks when the jury was not in the courtroom.  Additionally, the Court virtually always granted sidebar conferences when asked by defense counsel, and by that late date in the long trial, the jury was accustomed to

them. (The Court estimates that it had already granted well over 100 sidebar conferences by then.) Neither defense counsel asked the Court any further question about the designation process, nor was there any objection or request for a different process. At the conclusion of that day, the designation of regular and alternate jurors was done in open court with double-folded slips of paper with Juror #s on them, unfolded and read by the Courtroom Deputy.[6] As before, there was no request for sidebar conference, nor any objection to the process.

All jurors continued to sit in their regular seats for another 2 days before the jury retired to deliberate, because the designation was done before the lengthy jury instructions were read to the jury. During these subsequent days, there were periods of time before the trial day began, during breaks, and after hours, and yet defense counsel made no objection nor request for any other method of designating the regular and alternate jurors, who had not yet been separated into 2 groups. The regular and alternate jurors were separated only upon the commencement of deliberations, and again there was no objection nor sidebar request by defense counsel.

Throughout more than 2 days of jury deliberations, there was no comment on this topic from defense counsel. The jury returned its verdict on July 24, 2006. For the first time on July 28, 2006, long after the jury found Defendants Curry and Baskerville guilty, did defense counsel for the first time claim that the process of selecting the alternate jurors violated Mr. Curry's right to a jury of his peers.

---

[6] Juror #s 4, 13, 1, 7, 16, 9, 14, 8, 2, 3, 6, and 5 were drawn to be regular jurors. Juror #s 17, 10 and 15 were drawn as alternates. Transcript of July 19, 2006, p. 103. All alternates remained in the Courthouse, ready to serve if needed. Nobody knew how long or short the deliberations would be. Juror # 12's number was not included among all of the remaining 15 jurors eligible to serve as alternates, as requested by defense counsel. Solely for the reasons stated in footnote 4, above, the Court notes that Jurors 2, 3, and 10 were African-American. Jurors 12 and 17 were Asian. The remaining jurors were Caucasian.

Juror # 10

Defendant Curry now states that the alternate designation of Juror #10 (whom the defense describes as a young African-American male) prejudiced Curry because he was one of the jurors similar in background to Mr. Curry.  Mr. Curry is a 30 year old African-American male with an 8th grade education.  During voir dire, Juror #10[7] stated that he has both a college degree and an advanced graduate degree of Masters in Strategic Management and International Business.  Transcript of May 17, 2006, p. 82.  Thus the only similarity between Curry and Juror #10 was their race.[8]  Defense counsel offer no law in support of the suggestion that race should be a factor in designating from a set group of jurors those who will be regular jurors and those who will serve as alternates.  In fact, such proposition itself is contrary to the principle of *Batson*.

Jurors # 15 & 17[9]

Curry argues that Juror # 15's selection as an alternate as also "disastrous" to the defense because, he contends, Juror # 15 (dubbed "Abraham Lincoln" by the defense) "demonstrated a visibly negative reaction to the Government on a number of occasions" and at the conclusion of the Government's case "shook his head and raised his hands as if to say, is that all there is?"  The

---

[7] Juror # 10's official juror # was 420.  When questioned in the panel for pre-qualification, he was seated in seat # 7.  When the pre-qualified groups were merged after the peremptory strikes were completed, he was seated in seat # 10 for the trial.

[8] Curry does not explain why regular Jurors # 2 and 3, both of whom were African-American, one of whom had limited education and one of whom had a job identical to Curry's wife's occupation, were not more similar in background to Mr. Curry.

[9] The defense claims that Juror # 17 had "some apparent African American heritage," and that his random designation as an alternate, therefore, prejudiced Curry.  As stated above in footnote 6, Juror # 17 was Asian; moreover, race is not a factor in the process of designating between regular and alternate jurors.  Juror # 15 was Caucasian.

Court saw no gestures by this Juror. Rule 24(c)(2)A) states that "alternate jurors must have the same qualifications and be selected and sworn in the same manner as any other juror." There is no law in support of the implicit contention by the defense that it could pick whom to designate as an alternate based on its perception of body language at the end of a long trial.

This Court finds that Curry's counsel knew and concurred in the process for designating the alternate jurors. Indeed, Defendants' arguments regarding jurors 15 and 17 clearly indicate that the defense neither wanted nor expected that the "last four in the box" would be chosen as alternates. That left only the random selection of alternates as the chosen method. There was no objection despite ample opportunity to do so. Defense counsel simply chose to wait until after the jury verdict came in, and only then to submit a post-trial motion voicing objection for the first time.

The purpose of objections is to let the Court know that a procedure is objectionable at a time when the Court can correct it. In this case, counsel concurred in the process from the outset, and not once informed the Court that it desired a different, undescribed, process. The motion is denied.

### Motion for New Trial on Ground of Prosecutorial Misconduct

The motion for new trial fails to designate grounds for the motion more specific than that to "rely on the record herein." This is entirely insufficient to form a basis for a motion for new trial.

Regularly throughout the long and contentious trial, Curry's counsel made motions claiming prosecutorial misconduct. They were made so often that the Court noticed a pattern: Each time that Curry's counsel was himself challenged about the propriety of some action, the

rejoinder was a claim of prosecutorial misconduct. The record is replete with such instances.[10] In sum, accusations of prosecutorial misconduct were regularly lobbed as a way of deflecting attention from a difficult subject. Sometimes they were done for no reason at all.[11]

No particularized basis for prosecutorial misconduct, discovery violations and violations of criminal rules having been articulated in this motion other than the "record of the case", this

---

[10] By way of example only, the Court notes that when the US Marshal informed the court that a Passaic County sheriff had overheard Baskerville tell Curry that a "we have a hit on Walker and we have the hitman already" to kill cooperating witness Walker, a memo with the precise quote was provided to defense counsel. The next morning, Curry's counsel submitted a brief that purported to repeat the quote, but added two words that dramatically changed the quote. When the Court cautioned counsel about such action, he immediately raised a claim of prosecutorial misconduct against the Assistant United States Attorneys. The claim was baseless. In another instance, Curry's counsel played a tape during the defense case. He asked the Court to give the jury a transcript of the tape, which the Court declined to do because it had not been provided in advance to the other side to check it's accuracy, as the Court required of both sides. When the tape was played by the defense, the Court followed along with the draft transcript that had been proffered by Mr. Plaisted. There was one line of the tape that was highly incriminating to Curry, whose nickname is "E.T. Hak." On the tape, the Curry confidant says to a witness who testified that Curry tried to hire him as a hitman to kill the cooperating witness "I told you they got like ninety G's from E.T. Hak, man they all into them niggers man, but that ain't thing I mean." The transcript proffered by Mr. Plaisted left a blank in the sentence where Curry's nickname "E.T.Hak" was spoken. The Court asked defense counsel about who checked the accuracy of the transcript and got vague answers. The Court then ordered all extra duplicates of the tape turned into the Court and a new duplicate original supplied to the defense expert by the Government, to avoid any risk that the defense expert would be analyzing a tape that had been the subject of the materially inaccurate transcript. This prudent action to avoid potential confusion evoked a claim that the Court was intruding into the attorney work product privilege.

[11] Once during trial, an Assistant Federal Public Defender (unrelated to the case) brought his friend, the mayor-elect, into the public section of the courtroom for 5 minutes before the lunch break. After the lunch break, Curry's counsel accused the DEA task force of misconduct by "inviting the mayor to use this case as a press conference." The mayor-elect was not invited by the Government, and there was no press conference nor press of any kind. But the accusation of misconduct was made.

Court denies the motion. The Court considered each claim of prosecutorial misconduct during trial and ruled that no prosecutorial misconduct occurred. Nothing in the instant motion warrants reconsideration of those rulings.

For the reasons set forth above,

IT IS on this 31st day of January, 2007,

ORDERED that Defendants' motions for a new trial (docket entries 466, 467) are DENIED.

/s/Faith S. Hochberg
Hon. Faith S. Hochberg, U.S.D.J.